IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2018 Session

## CLARK BEAUREGARD WATERFORD III v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2637     J. Randall Wyatt, Jr., Judge**

_____

**No. M2017-01968-CCA-R3-PC**

_____

A jury convicted the Petitioner, Clark Beauregard Waterford III, of second degree murder for the stabbing of Ms. Faye Burns, and the Petitioner was sentenced to serve forty years in prison.  After the Petitioner's conviction and sentencing, DNA evidence favorable to the Petitioner came to light, and the Petitioner sought post-conviction relief.  The post-conviction court determined that the Petitioner had not received the ineffective assistance of trial counsel, that the Petitioner had not established entitlement to relief based on the State's failure to provide exculpatory evidence, and that the Petitioner was not entitled to relief under the Post-Conviction DNA Analysis Act of 2001.  After a thorough review of the record, we conclude that the Petitioner is not entitled to post-conviction relief, and we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joshua Brand, Nashville, Tennessee, for the appellant, Clark Beauregard Waterford III.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn Funk, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Petitioner's claims in this appeal center around DNA evidence from a laboratory report issued during the pendency of the motion for a new trial. The State had submitted the victim's fingernail scrapings for DNA testing prior to the Petitioner's trial, but the testing was not completed until after the Petitioner's conviction and sentencing. The test results showed DNA from a biological male other than the Petitioner under the victim's fingernails, and the trial court granted the Petitioner's post-conviction request to perform DNA testing on the knife which was the purported murder weapon. DNA on the knife's handle was so limited that tests comparing it with the Petitioner's DNA were inconclusive, and two limited DNA profiles present on the blade excluded both the Petitioner and the victim as contributors. The Petitioner sought a new trial through a timely post-conviction petition, asserting claims of ineffective assistance of counsel, suppression of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and a violation of due process.

## Trial

The Petitioner was convicted of second degree murder after the victim's boyfriend, Mr. Clayton "Red" Harris, found the victim stabbed in the neck in her home in the early morning hours of May 11, 2010. While suspicion initially focused on Mr. Harris, investigators established the Petitioner's presence at the scene through a receipt for orange juice found in the victim's home and through surveillance video showing the Petitioner purchasing the orange juice on the night of the murder. The victim did not have a telephone, but Mr. Harris told police that the victim contacted him by telephone several times on the night of the murder. Investigators established that telephones belonging to the Petitioner placed several calls to Mr. Harris's telephone that night. The Petitioner fled to Kansas City and, having been apprehended the following month, made inculpatory statements to police. The Petitioner acknowledged being present at the victim's home on the night of the murder and becoming involved in an altercation with the victim. The Petitioner told police that the victim attacked the Petitioner with a knife and that the Petitioner engaged in self-defense. This court summarized the evidence at trial on direct appeal as follows:

> At approximately 6:00 a.m. on May 11, 2010, Clayton Harris found the body of the victim, Faye Burns, lying in a puddle of blood on her bedroom floor next to her bed. There were significant amounts of blood on the bed, the floor, and the victim. By the time the police arrived, the blood appeared to be "somewhat coagulated." The victim's shirt and bra had

- 2 -

been partially removed, exposing part of her breasts. The victim's pants were still on, but they had been "unbuttoned and unzipped." The room appeared to be in disarray, as if there had been some kind of struggle. Various objects had been knocked over, items were scattered across the floor, and there was some broken glass on the floor. A knife and a glass ashtray were found in the bedroom. The knife was clean and had no blood or fingerprints on it. A change purse was also found in the bedroom, but it contained no money.

In addition to the blood found in the victim's bedroom, the police found blood stains on the sink and toilet in the victim's bathroom. A towel that appeared to be stained with blood was found on the floor outside the bathroom. There were five red stains that appeared to be blood on the wall of a staircase leading to the downstairs area of the victim's apartment. There were also two small stains that appeared to be blood on the front door of the apartment. There was no evidence that anything had occurred in the downstairs portion of the apartment. The police were unable to obtain any useful fingerprints inside the victim's apartment. The police did locate a receipt from a local Dollar General Store in an unused bedroom in the apartment. The receipt was dated May 10, 2010, and time-stamped at 8:46 p.m.

Mr. Harris testified that he was the victim's boyfriend and that he spent most nights at the victim's apartment. According to Mr. Harris, the victim would drink until she was intoxicated five or six days a week. Mr. Harris testified that when the victim got "full of them drinks" she would "get to raising hell, playing loud ass music, and cursing, and picking up things and throwing them." Mr. Harris stated that when the victim became belligerent, he would leave the apartment and return the next morning. Mr. Harris claimed that the victim had previously scratched his neck and slammed his thumb in a door but that those were the only times she had ever physically hurt him.

Mr. Harris testified that on May 10, 2010, he received some money and gave the victim fifty dollars. He and the victim ran some errands and did some shopping that morning before returning to the victim's apartment. Mr. Harris admitted that he "started getting high" while at the apartment and that he had smoked crack cocaine that day. Mr. Harris believed that the victim had also smoked cocaine that afternoon. The victim's friend, Michael Eubanks, came to the apartment and spent the afternoon with the victim and Mr. Harris. At some point, the victim left to purchase a fifth of

- 3 -

whisky.  Mr. Harris testified that when the victim returned, she drank "that whole fifth of [whisky] like it was water."

According to Mr. Harris, sometime around 4:30 p.m. "all hell broke loose" and the victim "started acting a fool and cussing" him and Mr. Eubanks, calling them "all kinds of b——hes and hoes."  Mr. Harris testified that the victim took his cell phone and slung it at Mr. Eubanks, "hit[ting] him upside the face."  Mr. Eubanks left shortly after that, around 5:00 p.m. A short time later, the victim kicked Mr. Harris out of the apartment.  Mr. Harris told the victim that he would be back the next morning to get his clothes.  Mr. Harris testified that there was no physical altercation between him and the victim and that he left when she told him to.  Mr. Harris then went to a friend's house where he spent the night.  The police later confirmed that Mr. Harris had stayed with a friend that night.

Mr. Eubanks testified at trial that he was a close friend of the victim and that he had been at her apartment all day on May 10, 2010.  Mr. Eubanks admitted that he sold crack cocaine to Mr. Harris and that he and the victim would "just [get] high together."  Mr. Eubanks claimed that he did not have any cocaine that day but had "smoked weed" instead.  Mr. Eubanks testified that the victim would get "a little belligerent" and "might get loud" when she was drunk but that she had never assaulted him.  Mr. Eubanks testified that he left the victim's apartment sometime after 5:00 p.m.  Mr. Eubanks claimed that he did not leave because the victim threw a cell phone at him.  According to Mr. Eubanks, the victim "tossed" the phone and "accidently hit [him] in the side of the head."  Mr. Eubanks testified that he left because the victim was getting drunk but stated that she "was acting fine" when he left.

Mr. Harris testified that the victim did not have a phone but that she called him around 9:00 p.m. that night from a number he did not recognize. The victim asked Mr. Harris to come back to her apartment, but Mr. Harris said to her, "F—k you, b——h, I ain't coming back down there no more til in the morning [to] get my clothes."  Mr. Harris testified that the victim continued to call him until 3:00 a.m. that morning, but he did not answer any more of her phone calls.  The next morning, Mr. Harris went to the victim's apartment and found the screen door and front door both unlocked. Mr. Harris went into the apartment and saw that the bedroom light was on. He called for the victim and went upstairs to the bedroom when he got no response.  Mr. Harris saw the victim's body and touched her chest to see if she was still alive.  Mr. Harris testified that he believed the victim was dead

so he ran outside and called 911. Mr. Harris waited outside for the police and then cooperated with their investigation.

Detective Johnny Crumby of the Metropolitan Nashville Police Department ("MNPD") testified that he was the lead investigator in this case. Det. Crumby interviewed Mr. Harris and examined Mr. Harris's cell phone. Det. Crumby testified that on May 10, 2010, Mr. Harris received several phone calls between 9:22 and 9:55 p.m. from two phone numbers belonging to [the Petitioner]. Det. Crumby also testified that based upon the Dollar General Store receipt found in the victim's second bedroom, he retrieved the store's video surveillance footage in hopes of seeing who the victim was with that night. Instead, the footage showed [the Petitioner], wearing an orange reflective vest and with … hair styled in a unique manner, making a purchase alone. Mr. Harris testified that he had never met [the Petitioner], but the victim had talked about [the Petitioner]. Mr. Eubanks testified that he had met [the Petitioner] at the victim's apartment and that the victim "fed [the Petitioner], housed [the Petitioner], [and] clothed [the Petitioner]." Mr. Eubanks further testified that the victim let [the Petitioner] stay at her apartment "when [the Petitioner] didn't have [anywhere else] to go."

After the victim's murder, [the Petitioner] fled to Missouri. [The Petitioner] was eventually apprehended and returned to Tennessee. [The Petitioner] … agreed to speak with Det. Crumby. During their conversation, [the Petitioner] asked Det. Crumby if "there [was] any such thing as self-defense in this state," and Det. Crumby responded that there was. [The Petitioner] then told Det. Crumby that [the Petitioner] had "been a victim of some things before" and that several years earlier [the Petitioner] had been kidnapped and severely beaten by a woman. [The Petitioner] told Det. Crumby that [the Petitioner] did not "want that to happen a second time." [The Petitioner] claimed that the victim was "very abusive to a number of people" and that she had "victimized" [the Petitioner] in the past. [The Petitioner] told Det. Crumby that [the Petitioner] was taking a bath at the victim's apartment when she became very upset [over the inadvertent use of] one of her towels and "then that's when the altercation began." [The Petitioner] claimed that the victim "confronted [the Petitioner] as soon as [the Petitioner] got out of the bathtub" and that she "started throwing things and pulling that little knife." Det. Crumby [said, "Then you just defended yourself,"] and [the Petitioner] responded, "right." [The Petitioner] told Det. Crumby that the evidence … appeared "to be irrefutable."

Det. Crumby testified that he did not know who owned the knife found in the victim's bedroom[, and that during the interview, he suggested it was the victim's in order to encourage the Petitioner to confess]. Mr. Harris testified that he had never seen the knife before and that he did not believe it belonged to the victim because she "wasn't the type to carry [a] weapon around with her." Additionally, the victim's daughter testified that her mother did not carry a knife or any other weapon. The victim's daughter also testified that her mother would carry her money either in her bra or in a change purse that she would sometimes place in her bra. Det. Crumby testified that he decided not to have any forensic tests performed on the blood and DNA evidence found in the victim's apartment after he interviewed [the Petitioner].

Dr. John B. Davis, an expert in forensic pathology, testified that he performed an autopsy on the victim. Dr. Davis determined that the victim was killed by a stab wound to the left side of her neck. The wound "cut through the carotid artery … and also damaged her esophagus." Dr. Davis testified that severing the carotid artery "would be very bloody" and that, due to the damage to the esophagus, the victim likely bled into the esophagus and swallowed "quite a bit of blood." Dr. Davis estimated that it took from a few minutes to thirty minutes for the victim to die from the stab wound. Dr. Davis testified it was possible the victim could have survived had medical help been sought, but he noted that if no pressure was applied to the wound, the victim would have suffered "a relatively short death." A close examination of the wound showed that the knife had been twisted before it was removed.

The victim also suffered a small stab wound on her left arm and several incised wounds on her left arm, neck, and breasts. Dr. Davis testified that he found two incised wounds, approximately two inches long, on the underside of each of the victim's breasts. Dr. Davis testified that the victim's breasts were large and that the area where the wounds were located would not normally be exposed. Dr. Davis explained that the victim's shirt and bra would have to be removed and her breasts would have to be "lifted" in order for the incised wounds to be made at that location. Dr. Davis testified that he found no holes in the victim's clothing [corresponding with the cuts]. The victim also suffered blunt force trauma injuries to the left side of her head and abrasions on her nose. Dr. Davis testified that these injuries were consistent with the victim having struck her head on a hard

object or being struck in the head with a hard object. Dr. Davis further testified that it was possible the victim had been knocked unconscious.

Dr. Davis testified that the knife found in the victim's bedroom could have cause[d] her stab and incised wounds, including the fatal wound to her neck. Dr. Davis opined that all of the victim's wounds were inflicted around the same time. Dr. Davis further opined that the fact that the blood was centered on the left side of the victim's bed and the floor was consistent with the victim having been lying down on the bed when she was stabbed in the neck. Dr. Davis noted that there were no defensive wounds on the victim's hands. The victim had both alcohol and cocaine in her blood at the time of her death. Dr. Davis testified that the victim's blood alcohol content was .28 percent, over three times the legal limit for driving in Tennessee.

*State v. Clark Beauregard Waterford, III*, No. M2011-02379-CCA-R3-CD, 2013 WL 2368830, at *1-4 (Tenn. Crim. App. May 30, 2013), *perm. app. denied* (Tenn. Oct 23, 2013).

The Petitioner's interview with Detective Crumby was played during trial. Detective Crumby told the Petitioner from the beginning of the interview that he was conducting the interview to investigate the victim's death. At the beginning of the interview, the Petitioner declined to answer a question about whether the Petitioner was in Nashville the night of the murder. Detective Crumby informed the Petitioner that law enforcement knew the Petitioner had been there and that they would conduct DNA testing to confirm the Petitioner's presence. Detective Crumby posited to the Petitioner that the victim was volatile and that the victim and Petitioner had been in a fight. After Detective Crumby detailed the manner of the victim's death, the Petitioner asked, "Is there any such thing as self-defense in this state?" During the interview, the Petitioner told police that the victim would share women's clothing with the Petitioner, assist the Petitioner in purchasing women's clothing, and introduce the Petitioner to others as a woman. The Petitioner eventually told Detective Crumby that the victim permitted the Petitioner to bathe at her home but not to use her towels and that after the Petitioner accidentally used the victim's towel, a confrontation ensued.

At trial, Detective Crumby testified that after the interview, he did not believe any DNA testing was necessary because the Petitioner had acknowledged being present at the scene of the crime, and the Petitioner's DNA would presumably be present. Detective Crumby elaborated that he would expect to find his own DNA under his wife's fingernails if she were to scratch his back or rub his head. On cross-examination, he acknowledged that he had obtained a DNA standard from the Petitioner in February, and

he testified, "[W]e did at [the prosecutor's] request send the evidence off." A report from the Tennessee Bureau of Investigation ("TBI") indicates that the agency received the DNA standard from the Petitioner on May 4, 2011. The trial commenced on May 23, 2011, prior to any testing being performed. Trial counsel argued in closing argument that the State's case was weakened by its failure to test the physical evidence.

On May 25, 2011, the jury returned a guilty verdict for the lesser-included offense of second degree murder. The Petitioner was sentenced to serve forty years in prison on July 15, 2011. At sentencing, the prosecutor introduced evidence that, during a prior rape the Petitioner had committed, the Petitioner had made a cut on the rape victim's breast similar to those inflicted on the victim of the homicide. The Petitioner moved for a new trial on July 26, 2011, asserting that the evidence was insufficient and that the trial court erred in ruling certain evidence admissible and in failing to grant a judgment of acquittal on the first degree murder charge. The motion for a new trial was heard on September 9, 2011, and denied on September 20, 2011, and the Petitioner filed a notice of appeal on October 19, 2011.

On August 4, 2011, prior to the hearing on the Petitioner's motion for a new trial, the TBI issued its report analyzing the physical evidence. The report indicated that a DNA profile was obtained from the victim's fingernail scrapings and that the profile belonged to an unknown male who was not the Petitioner. The victim's fingernail clippings indicated no DNA other than her own. The record does not reveal when the prosecutor became aware of this report.

On August 20, 2012, during the pendency of the direct appeal, the Petitioner filed a pro se motion requesting DNA testing of the physical evidence collected from the scene pursuant to Tennessee Code Annotated section 40-30-304. The State, in its response on September 26, 2012, attached the August 4, 2011, report indicating the results of the testing of the victim's fingernail scrapings. On January 23, 2013, the Petitioner, through counsel, moved to withdraw the petition for post-conviction DNA analysis, noting that the Petitioner believed that the issues raised would overlap with post-conviction issues which could not be addressed until the conclusion of appellate proceedings and that withdrawing the petition would not waive any claims raised in the motion requesting DNA analysis. On appeal, this court rejected challenges to the sufficiency of the evidence, to a ruling on the admissibility of impeachment evidence, and to the sentence imposed, and the Tennessee Supreme Court denied permission to appeal on October 23, 2013. *Clark Beauregard Waterford, III*, 2013 WL 2368830, at \*1.

**Post-Conviction Petition and DNA Analysis**

On August 7, 2014, the Petitioner filed for post-conviction relief, asserting that trial counsel was deficient in failing to request DNA testing, failing to offer an explanation for the wounds under the victim's breasts, and failing to highlight the wounds documented on the victim's boyfriend, Mr. Harris; that the State had withheld exculpatory evidence in the form of the DNA testing of the victim's fingernail scrapings; and that trial in the absence of the DNA evidence was a violation of due process.

The Petitioner also requested, pursuant to the Post-Conviction DNA Analysis Act of 2001, DNA testing of the knife that the State theorized was the murder weapon, and the State did not oppose the motion. The knife was found neatly placed on a pillow next to an ashtray, on the side of the bed that did not show extensive blood stains. Chemical testing showed that the knife bore no traces of blood, but two incomplete DNA profiles were present on the blade. Both the victim and the Petitioner were excluded as possible contributors to the two profiles obtained from the blade. The handle revealed traces of DNA, but the profile obtained was so limited that the results of comparison to the DNA of the Petitioner and victim were inconclusive.

At the post-conviction hearing, the Petitioner's trial counsel testified that he had worked for the public defender's office for over twenty years, handling exclusively criminal matters, particularly serious, violent felonies. He had tried numerous murder cases, including cases involving DNA evidence and death penalty cases. Trial counsel filed a discovery request which asked the State to disclose any exculpatory material, including "the results of any scientific tests" which "did not implicate or w[ere] neutral to" the Petitioner. Trial counsel testified that he was aware that physical evidence, including fingernail scrapings and a knife, was collected, but he was not aware that the State submitted any items to the TBI for DNA testing. He first became aware that the victim's fingernail scrapings were submitted for analysis during trial, when Detective Crumby testified that the assistant district attorney general had requested him to obtain analysis of the scrapings and that the scrapings were submitted for analysis. Trial counsel stated that he would have asked for a continuance if he had known that the DNA had been submitted for testing and that he would have asked for testing of other items and independent testing.

Trial counsel testified that because the Petitioner had admitted being involved in an "altercation" with the victim, trial counsel expected that the Petitioner's DNA might be present under the victim's fingernails even if a third party assailant were the actual subsequent murderer. He agreed that because the Petitioner had admitted to an altercation, DNA evidence showing the Petitioner's DNA under the victim's fingernails would not have been particularly damaging to the Petitioner's case, while evidence of a

third party's DNA under the victim's nails would have been helpful. Trial counsel testified that law enforcement described the knife as "wiped clean" and that the parties did not expect any DNA evidence to remain. He agreed that DNA evidence would not necessarily be apparent to the naked eye and that evidence that the knife contained DNA from a source other than the Petitioner would have been helpful at trial.

Trial counsel agreed that evidence that the knife contained DNA which excluded the Petitioner and victim could have been helpful, noting that he could have argued that the victim survived any altercation and that another male then attacked her and left DNA on the knife. On cross-examination, however, he agreed that the value of the DNA evidence recovered from the knife blade was limited because the victim was also excluded as a possible contributor. The DNA profile obtained from the handle was so limited that the results of comparison to standards from the Petitioner and victim were inconclusive.

Trial counsel believed the primary evidence against the Petitioner was the statement to police. The Petitioner was "anxious to be cooperative" and responded to questioning "by agreeing." When Detective Crumby stated, "Then you just defended yourself," the Petitioner agreed. In the statement, the Petitioner did not provide many details regarding the crime. Trial counsel acknowledged, however, that the Petitioner declined to answer certain questions at the beginning of the interview, demonstrating that the Petitioner was not simply agreeing with prosecutors but was aware of his constitutional right to remain silent. Trial counsel also agreed that Detective Crumby explicitly informed the Petitioner that the interview concerned the victim's death and that Detective Crumby provided numerous details regarding the death, making it unlikely that the Petitioner could believe that the questions related to some nonfatal altercation. Trial counsel confirmed that the Petitioner's response to a detailed description of the cause of death was to ask, "Is there such a thing as self-defense in this state?" The Petitioner also asserted in the interview that the proof appeared "irrefutable" and referenced the victim's pulling out a small knife. On redirect examination, trial counsel testified that confessions can be unreliable and that he was familiar with cases in which DNA evidence had exonerated defendants. He agreed that raising reasonable doubt in the mind of the jury might have changed the result of the trial.

Trial counsel recalled that even shortly before trial, the Petitioner was vacillating between alternate theories, including self-defense, mistaken identity, and a third-party assailant. He observed that the victim's boyfriend, Mr. Harris, was "conveniently available" and had been in an argument with the victim the night before her death. Mr. Harris testified that the victim called him numerous times at 2:00 or 3:00 a.m. but that he refused to come to her house until the next morning, when he discovered the body. Mr. Harris had minor scratches on his hand and the back of his head. Trial counsel testified

- 10 -

that scrapings were collected from under Mr. Harris's fingernails but that the scrapings were not tested and a DNA standard was not collected from Mr. Harris.

Trial counsel agreed with the prosecutor that there were hurdles to presenting Mr. Harris as the killer. He recalled that law enforcement performed tests which indicated an absence of blood on Mr. Harris's clothing and body, despite the fact that the murder scene was particularly bloody. Trial counsel agreed that law enforcement confirmed that Mr. Harris stayed the night with a friend on the night of the murder and that police later established that the telephone numbers the victim was using to contact Mr. Harris that night belonged to the Petitioner. Mr. Harris discovered the victim's body early in the morning when he went by to retrieve some belongings, and he immediately contacted police and cooperated with the investigation, while the Petitioner fled. Trial counsel agreed that the injuries to Mr. Harris's head were so minor that they were difficult to discern in the photographs of Mr. Harris taken by police, that his hands had very minor scratches and a contusion on his thumb, and that the injuries did not appear consistent with a fatal battle.

Trial counsel testified that he did not introduce an alternative explanation for how the victim sustained injuries under her breasts. He stated that he was unable to provide a viable alternative explanation and that he wanted to avoid drawing attention to the injuries because he thought the jury might associate the Petitioner's dressing in women's clothing with the injuries and the murder.

The post-conviction court denied relief. The post-conviction court found that trial counsel was not deficient in failing to request DNA testing because he reasonably expected that the results would be inculpatory and that in any case, the evidence at trial was so strong that the testing would not have produced a reasonable probability of a different result. The post-conviction court likewise found neither deficiency nor prejudice in trial counsel's failure to pin the murder on Mr. Harris or to provide an explanation of the wounds to the victim's breasts. Although the court found that trial counsel was never informed that the victim's fingernail scrapings had been submitted for testing, it concluded that the mere fact that evidence was submitted for testing was not material, exculpatory, nor requested during discovery pursuant to *Brady*. Regarding the result of the testing of the victim's fingernail scrapings, the court found that the Petitioner failed to establish either that the State suppressed the evidence or materiality. The post-conviction court likewise found that the results of the DNA testing of the knife were not so significant as to undermine confidence in the verdict, pointing to the strength of the Petitioner's statement to police, to other evidence corroborating the Petitioner's presence at the crime scene, and to problems with the theory that Mr. Harris was the true killer.

## ANALYSIS

The Petitioner argues that post-conviction relief is warranted based on ineffective assistance of counsel, the State's suppression of evidence, and the contention that a trial without the DNA evidence was a violation of due process.

A petitioner is entitled to post-conviction relief when "the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden of proving allegations of fact in the petition by clear and convincing evidence falls to the petitioner seeking relief. T.C.A. § 40-30-110(f). The post-conviction court's findings of fact are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Accordingly, the reviewing court defers to the post-conviction court's findings regarding the credibility of witnesses, the weight and value of witness testimony, and the resolution of factual issues. *Id.* "The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness." *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

### I. Ineffective Assistance of Counsel

The Petitioner asserts that trial counsel was ineffective in failing to secure independent testing of the physical evidence which counsel knew had been collected. The State responds that the Petitioner has established neither deficiency nor prejudice.

The right to counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). The right to counsel encompasses "the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in criminal cases.'" *Id*. (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In evaluating a claim of ineffective assistance of counsel, the court must determine "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 686).

To show that relief is warranted on a claim of ineffective assistance of counsel, the petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007). Deficiency requires showing that counsel's errors were so serious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To demonstrate deficiency, the petitioner must show that

counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant*, 263 S.W.3d at 868. Courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689). "'[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). In evaluating counsel's performance, "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland*, 466 U.S. at 690-91). The reviewing court must begin with "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "That is, the Petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316. "A reasonable probability of being found guilty of a lesser charge, or receiving a shorter sentence, satisfies the second prong of *Strickland*." *Pylant*, 263 S.W.3d at 869. Because both prongs must be established for relief, a court need not address both if the defendant has failed to prove either deficiency or prejudice. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

The post-conviction court found that trial counsel's failure to test the physical evidence for DNA was not deficient, and we agree. The Petitioner's presence in the victim's home was established by the circumstantial evidence of the dollar store receipt for two bottles of orange juice and the dollar store videotape showing the Petitioner retrieving and purchasing the orange juice at the time reflected on the receipt. It could also be inferred from the telephone calls to Mr. Harris placed from the Petitioner's telephones. The Petitioner's statement acknowledged not only that the Petitioner was in the home bathing but also that the Petitioner and the victim engaged in an "altercation." The Petitioner's established presence in the home and statement about an altercation led trial counsel to infer that the Petitioner's DNA might be present at the crime scene. Trial counsel made a reasonable, strategic choice to avoid testing evidence which he rationally

- 13 -

expected would produce results that were inculpatory to the Petitioner. While the results of the testing of the victim's fingernail scrapings ultimately proved favorable to the Petitioner, trial counsel's actions are not judged by 20-20 hindsight, *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997), but instead evaluated from counsel's perspective at the time, *Goad*, 938 S.W.2d at 369. We conclude that trial counsel made a reasonable strategic decision and did not perform deficiently in choosing not to test the physical evidence. *See Tremaine Roberson v. State*, No. W2014-00400-CCA-R3-PC, 2015 WL 5173067, at *4-5 (Tenn. Crim. App. Sept. 2, 2015) (concluding that decision to avoid DNA testing was a reasonable strategic decision); *Wayne E. Mitchell v. State*, No. 01C01-9507-CR-00227, 1996 WL 234053, at *2 (Tenn. Crim. App. May 9, 1996) (concluding that decision not to test DNA was a strategic choice and that "[c]ounsel's decision not to pursue a DNA test was based on a realistic apprehension of creating detrimental evidence that did not exist"); *cf. Tommy Nunley v. State*, No. W2003-02940-CCA-R3-PC, 2006 WL 44380, at *6 (Tenn. Crim. App. Jan. 6, 2006) (concluding that trial counsel's failure to request DNA analysis was not strategic but noting that "the decision to forego testing may rest firmly upon an informed decision or upon a strategic decision that a positive result could be fatal to the defendant's case"). The Petitioner has not shown that trial counsel performed deficiently and is not entitled to relief.

## II. Suppression of Evidence

The Petitioner next asserts that the prosecution suppressed the evidence of the DNA testing, which ultimately proved favorable to the defense, and that the evidence should have been disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The State responds that the Petitioner's claim can only extend to the prosecution's act of submitting the fingernail scrapings for testing and not to the results of the testing, and the State argues that the Petitioner has failed to establish the requisites for a *Brady* claim.

In *Brady*, the United States Supreme Court held that the suppression of evidence favorable to the defendant is a due process violation where the evidence is material to guilt or punishment. *Id.* In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the information or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the information was favorable to the accused; and (4) the information was material. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *State v. Cureton*, 38 S.W.3d 64, 77 (Tenn. Crim. App. 2000) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514

- 14 -

U.S. 419, 434 (1995). A violation is established by showing that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. The defendant has the burden of proving a violation by a preponderance of the evidence. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995), *as amended on rehearing* (Tenn. July 10, 1995).

The rule in *Brady* applies "not only to evidence in the prosecution's possession, but also to 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Jackson*, 444 S.W.3d at 594 (quoting *Strickler v. Greene,* 527 U.S. 263, 275 n.12 (1999)). This includes "evidence in police possession which is not turned over to the prosecution." *Id.*; *see Wearry v. Cain*, 136 S. Ct. 1002, 1006-07 n.8 (2016) (noting that an inmate's statement made during trial to police required disclosure even if it was not known to the prosecutor). The prosecution is not, however, under a duty to disclose information that the accused either possesses or is able to obtain. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). Nor is there a constitutional requirement "'that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.'" *Id.* (quoting *State v. Walker*, 910 S.W.3d 381,390 (Tenn. 1995)). *Brady* requires an evaluation of any suppressed evidence cumulatively rather than in isolation. *Wearry*, 136 S. Ct. at 1007; *Kyles*, 514 U.S. at 436.

The post-conviction court found that the State submitted the fingernail scrapings for testing prior to trial but that the results were not available until after the Petitioner had been convicted. The post-conviction court concluded that the fact that the scrapings were submitted for testing was not requested in discovery, was not in itself favorable to the Petitioner, and was not material. The post-conviction court further found that while the results of the testing were favorable and had been requested in discovery, the State did not have the results at the time of trial and the results were not material given the strong evidence against the Petitioner. The Petitioner does not argue that the DNA testing of the knife, which was not performed until after the post-conviction petition was filed, was improperly withheld by the prosecution.

The prosecution's obligation to disclose exculpatory material is satisfied when the material is disclosed in time for the defendant to use it effectively at trial. *See United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (finding no *Brady* violation where the material was disclosed at trial and the defendant refused an opportunity to postpone the trial); Wayne R. LaFave et al., 6 Crim. Proc. § 24.3(b) n.88 (4th ed. 2017). "Although the complete non-disclosure of significant exculpatory evidence often makes an easy case for a due process violation, delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting). Because a violation occurs only when the suppression of

material exculpatory evidence prevents its effective use at trial, "'*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.'" *State v. Justin Terrell Knox*, No. W2014-01577-CCA-R3-CD, 2015 WL 6122257, at *4 (Tenn. Crim. App. Oct. 16, 2015) (quoting *Davis*, 306 F.3d at 421).

Regarding the failure to disclose the fact that the clippings had been submitted for testing, we agree with the post-conviction court that the Petitioner has failed to establish a *Brady* violation. Initially, the Petitioner did not request information regarding the submission of items for testing, but only the results of such testing. We also agree with the post-conviction court that the mere fact that the samples had been submitted for testing was not in itself favorable to the Petitioner; on the contrary, all parties expected the testing to prove inculpatory. Trial counsel was aware that a DNA sample was taken from the Petitioner in February. Furthermore, trial counsel became aware that the items were submitted for testing during trial in May. While the Petitioner points to trial counsel's testimony that he would have requested a continuance had he known that the evidence had been submitted for testing, Detective Crumby in fact testified at trial that the evidence had been submitted for testing pursuant to the prosecutor's request. Trial counsel did not, in fact, request a continuance in light of this revelation. Neither was the mere fact that the items were submitted for testing material, as there is no reasonable probability that the result of the proceeding would have been different had the prosecutor informed the defense earlier that testing was being performed. *See Cureton*, 38 S.W.3d at 77.

Whether the prosecution was obligated to turn over the results of the testing once the tests were performed presents a more difficult question. We note that the results of the testing, i.e., the discovery of the DNA of a biological male who was not the Petitioner under the victim's fingernails, is favorable to the Petitioner. Likewise, the Petitioner requested the evidence in discovery. Accordingly, we are left to consider suppression and materiality. *See Jackson*, 444 S.W.3d at 594.

It is clear that the prosecution has a continuing obligation to disclose exculpatory evidence which was in existence at the time of trial and sentencing. *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987) ("[T]he duty to disclose is ongoing…, and the court [after in camera review of sensitive evidence] would be obligated to release information material to the fairness of the trial."). However, in *District Attorney's Office for Third Judicial District v. Osborne,* the United States Supreme Court suggested that the prosecution's obligations under *Brady* were limited to trial evidence. 557 U.S. 52, 68 (2009). In *Osborne*, where the petitioner sought to compel the prosecution to produce physical evidence which the petitioner desired to test for DNA at his own expense in order to obtain post-conviction relief, the Supreme Court concluded that the Court of Appeals had committed error "in concluding that the Due Process Clause requires that

- 16 -

certain familiar preconviction trial rights be extended to protect Osborne's postconviction liberty interest." *Id.* at 59, 68. The Court noted that no precedent would require the disclosure obligation to continue "after the defendant was convicted and the case was closed." *Id.* at 68. Noting that a valid conviction would rob a defendant of the presumption of innocence, the Court determined that the petitioner's right to due process "must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Id.* at 69. The Court concluded that *Brady* was simply the "wrong framework" to address the prosecution's obligations to turn over evidence in post-conviction proceedings and instead considered whether the State of Alaska's post-conviction remedies were so deficient that they offended principles of justice and fundamental fairness. *Id.*

Here, the Petitioner was convicted in May and sentenced in July 2011. On August 4, 2011, the TBI issued its report to the "Metro Nashville P.D." confirming that the victim's fingernail scrapings contained male DNA which excluded the Petitioner as a potential contributor. Knowledge of exculpatory evidence is imputed to the prosecution when it is possessed by a State actor. *Jackson*, 444 S.W.3d at 594. It appears that the prosecution possessed the exculpatory material after the Petitioner's trial and sentencing but prior to the trial court's ruling on the motion for a new trial in September.

There is authority supporting both the contention that the prosecution's obligations under *Brady* extend through direct appeal and the contention that the obligations terminate with trial and sentencing. Some courts have interpreted *Osborne* to stand for the proposition that the prosecution is obligated to disclose only exculpatory material that was available at the time of trial or sentencing. *See Estrada v. Healey*, 647 Fed. App'x 335, 338 (5th Cir. 2016), *cert. denied,* 137 S. Ct. 226 (2016) (noting that the petitioner did not cite authority "establishing a due process right to the timely disclosure of exculpatory evidence discovered after his conviction" and that *Osborne* "explicitly declined to extend *Brady's* pre-trial protections to the post-conviction context"); *Browning v. Trammell*, 717 F.3d 1092, 1104 (10th Cir. 2013) (noting that "it is inappropriate to consider evidence developed post-verdict" because the essence of a *Brady* claim requires evaluating how withheld evidence would have affected the jury); *Whitlock v. Brueggemann*, 682 F.3d 567, 587-88, 589 (7th Cir. 2012) ("As we have stressed, the continuing *Brady* obligation that applies … covers only evidence that existed at the time of the original trials."); *see also Leonard D. Hutchison & James Harper v. State*, No. 03C01-9606-CR-00232, 1997 WL 789923, at *8-9 (Tenn. Crim. App. Dec. 23, 1997) (rejecting a *Brady* claim for the nondisclosure of FBI forms that were not created until after the trial).

On the other hand, some courts have concluded that the government's obligation to disclose exculpatory material extends through the conclusion of a direct appeal. *See*

*Fields v. Wharrie*, 672 F.3d 505, 514-15 (7th Cir. 2012) (concluding in a 42 U.S.C.A. § 1983 suit that "a prosecutor's *Brady* and *Giglio* obligations remain in full effect on direct appeal and in the event of retrial because the defendant's conviction has not yet become final, and his right to due process continues to demand judicial fairness"); *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2009) (concluding in a § 1983 suit that evidence discovered while prosecutors were involved in new trial and post-conviction proceedings was subject to disclosure); *see also Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) (accepting the government's concession that the prosecution's duty to disclose extended to evidence discovered prior to the ruling on the motion for a new trial).

We have determined that we need not address the issue of whether the prosecution was obligated to disclose the evidence which surfaced after trial and sentencing but prior to the ruling on the motion for a new trial. Even assuming that the prosecutor was obligated to disclose the information, the Petitioner has failed to demonstrate materiality under *Brady*. In *Smith v. Roberts*, the prosecution conceded that it was obligated to disclose exculpatory information which came to light after sentencing but prior to the motion for a new trial. 115 F.3d at 820. The appellate court noted that prompt disclosure would have allowed the petitioner to use the evidence in a motion for a new trial, and it concluded that "the proceeding upon which the [materiality] element must focus is the new trial motion, not the trial itself." *Id.* The Tenth Circuit concluded that the petitioner did not establish materiality because the post-conviction court evaluated his claim under the same standard that the trial court would have used to evaluate the motion for a new trial, and accordingly the delay did not affect the outcome of the motion for a new trial proceeding. *Id.*

We agree that under *Brady*, the materiality analysis must focus on prejudice accruing after the prosecution is imputed with an awareness of the evidence. Here, the Petitioner cannot establish a *Brady* claim based on the effect that the evidence would have had at trial because the Petitioner cannot establish, as an element of relief, that the prosecution suppressed evidence in its possession at trial. Indeed, not only was the evidence of the favorable DNA testing not in the prosecution's possession during trial, it did not exist at all. Accordingly, the materiality analysis must focus on the point at which the evidence came into existence and into the prosecution's possession.

Here, had the prosecution disclosed the test results on August 4, 2011, the Petitioner could have amended the motion for a new trial to request relief. The Petitioner could likewise have filed a petition for error *coram nobis* based on the newly discovered evidence. However, the Petitioner has not articulated what claims were foreclosed by the delayed disclosure, nor has the Petitioner shown that the same claims could not have been asserted at the time that the defense actually became aware of the results of the testing.

The Petitioner does not specify what errors could have been raised at the motion for a new trial that were precluded on post-conviction review. Accordingly, the Petitioner's claims regarding the results of the testing of the fingernail scrapings do not establish that the Petitioner is entitled to relief based on the prosecution's failure to timely disclose exculpatory material under *Brady*.

### III. Due Process

The Petitioner next generally asserts that a trial in the absence of the late-discovered DNA evidence was a violation of due process and requires a new trial. The Post-Conviction DNA Analysis Act of 2001 provides for the opportunity to obtain DNA testing for offenders convicted of enumerated offenses. *Griffin v. State*, 182 S.W.3d 795, 798 (Tenn. 2006). Testing is mandatory when:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304.

Additionally, the court may, in its discretion, order testing when:

> (1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

- 19 -

(3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-305.

A reasonable probability under the statute is a probability sufficient to undermine confidence in the outcome. *Powers v. State*, 343 S.W.3d 36, 55 (Tenn. 2011). "Under either the mandatory or discretionary provision, all four elements must be met before DNA analysis will be ordered by the court." *Id.* at 48-49, 54 (citing Brandon L. Garrett, *Claiming Innocence*, 92 Minn. L. Rev. 1629, 1676 (2008) for the proposition that the threshold showing of materiality mirrors the standard in *Brady*).

In determining whether this standard has been satisfied, the court indulges in a presumption that the results will be exculpatory. *Id.* at 55; *Pervis Payne v. State,* W2007-01096-CCA-R3-PD, 2007 WL 4258178, at *10 (Tenn. Crim. App. Dec. 5, 2007); *Jack Jay Shuttle v. State,* No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *5 (Tenn. Crim. App. Feb. 3, 2004). The court examines the remaining evidence in view of the possible effect that exculpatory evidence would have had on the fact-finder or prosecution. *Powers*, 343 S.W.3d at 55. "[T]he analysis must focus on the strength of the DNA evidence as compared to the evidence presented at trial—that is, the way in which 'the particular evidence of innocence interacts with the evidence of guilt.'" *Id.* (quoting Garrett, 92 Minn. L.Rev. at 1646). This analysis does not constitute a mere reevaluation of the sufficiency of the convicting evidence viewed in the light most favorable to the State. *Id.* at 57 (concluding that the petitioner was entitled to DNA testing of biological evidence of rape because the court would presume that the results would be exculpatory in that any DNA other than the petitioner's would match that of an offender in a DNA database rather than that of the victim's boyfriend, with whom she had had consensual sex prior to the rape). Ultimately, the court in *Powers v. State* examined whether presumptively favorable evidence would have resulted in reasonable doubt held by at least one juror. *Id.* at 58.

The Act contemplates that the post-conviction court will evaluate the results of completed DNA testing before further proceedings to grant relief:

If the results of the post-conviction DNA analysis are not favorable to the petitioner, the court shall dismiss the petition, and make further orders as

- 20 -

may be appropriate. If the results of the post-conviction DNA analysis are favorable, the court shall order a hearing, notwithstanding any provisions of law or rule of court that would bar the hearing as untimely, and thereafter make orders as are required or permitted by the rules of criminal procedure or part 1 of this chapter [the Post-Conviction Procedure Act].

T.C.A. § 40-30-312.

The State asserts that the scope of appellate review of the post-conviction court's denial of relief is limited. *See Jack Jay Shuttle*, 2004 WL 199826, at *4; *Donnie E. Johnson v. State*, No. W2006-02208-CCA-R3-PD, 2007 WL 852147, at *4 (Tenn. Crim. App. Mar. 22, 2007). We note that we are not reviewing the court's decision to grant or deny DNA analysis; the request for DNA analysis was unopposed, the analysis was conducted, and neither party challenges the order for analysis. Instead, the Petitioner is challenging the denial of his petition for post-conviction relief, which asserts claims in light of the results of the new DNA evidence. Accordingly, we apply the standard of review applicable to judgments rendered under the Post-Conviction Procedure Act. The post-conviction court's factual findings are binding on appeal unless the evidence preponderates otherwise, but its legal conclusions and determinations of mixed questions of law and fact are reviewed de novo. *Kendrick*, 454 S.W.3d at 457.

As post-conviction counsel noted, there is some absence of clarity regarding the procedure for providing relief after the discovery of favorable evidence pursuant to the Act. The Petitioner suggests that this court should treat the claim as analogous to a claim for error *coram nobis*. However, the Petitioner has not asserted an error *coram nobis* claim either in the appellate brief or in front of the post-conviction court. The Tennessee Supreme Court, in *Tommy Nunley v. State*, recently cautioned against conflating a claim under *Brady* asserting a due process violation with one alleging that the petitioner is entitled to the writ of error *coram nobis* based on newly discovered evidence. No. W2016-01487-SC-R11-ECN, 2018 WL 3468745, at *12, __ SW3d __ (Tenn. July 19, 2018). The *Tommy Nunley* Court refused to consider the petitioner's *Brady* claim because the petitioner submitted the claim "under the rubric of a petition for a writ of error *coram nobis*." *Id.* at *13. Accordingly, while the Petitioner's claims here may sound in *coram nobis*, we do not address the DNA evidence as newly discovered evidence under the statutory provisions related to *coram nobis* because the Petitioner did not present such an argument to the post-conviction court or on appeal. *See id.* at *12. ("In cases in which a petitioner seeks relief via a petition for writ of error *coram nobis* as well as post-conviction proceedings, both based on newly discovered evidence improperly suppressed by prosecutors at trial, each claim for relief should be presented and evaluated on a separate track, so to speak—the first in accordance with the *coram*

*nobis* statutes, and the second for a constitutional *Brady* violation under a petition for post-conviction relief.").

By the plain terms of the statute, the relief contemplated subsequent to DNA testing is relief under the Rules of Criminal Procedure, such as a motion for a new trial, or relief under the Post-Conviction Procedure Act. This relief is available "notwithstanding any provisions of law or rule of court that would bar the hearing as untimely." T.C.A. § 40-30-312. The Petitioner's claims regarding the DNA on the knife and under the victim's fingernails were raised in a timely post-conviction petition. The Petitioner did not request a writ of error *coram nobis* after the discovery of the DNA under the victim's fingernails but instead filed a post-conviction petition approximately two years later. The Petitioner was then granted permission to test the knife, and the claims regarding the results of both tests were included in the timely post-conviction petition. The Petitioner argues that trial in the absence of the DNA evidence resulted in the denial of due process, but the appellate brief contains no citation to any caselaw that stands for the proposition that due process mandates a new trial upon the discovery of favorable evidence after conviction.

"[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." *Spencer v. Texas,* 385 U.S. 554, 563-64 (1967). However, the Due Process Clause has "limited operation" beyond the guarantees listed in the Bill of Rights, and "the category of infractions that violate 'fundamental fairness'" has been defined "very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990); *see Beuke v. Houk*, 537 F.3d 618, 639-40 (6th Cir. 2008) (noting that state court's ruling admitting victim impact testimony would constitute a constitutional violation only if it rendered the trial fundamentally unfair). Accordingly, the question is whether the action complained of violates those "'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Dowling*, 493 U.S. at 353 (quoting *United States v. Lovasco,* 431 U.S. 783, 790 (1977)). The presumption of innocence no longer cloaks a defendant who has been convicted at a fair trial. *Herrera v. Collins*, 506 U.S. 390, 399 (1993). Instead, the court must determine whether the challenged conduct undermined the fundamental fairness of the entire trial. *Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159, 162, 166, 168 (3d Cir. 2015) (affirming habeas corpus relief for petitioner who articulated a due process claim based on the fact that scientific evidence used to convict him had subsequently been discredited); *see also United States v. Candelaria-Silva*, 166 F.3d 19, 37 (1st Cir. 1999) (concluding that combination of *Brady* material and newly discovered evidence did not create a reasonable probability of a different result at trial). When a petitioner alleges that evidence is admitted in violation of due process, the court analyzes the materiality of the evidence. *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000), *as amended on denial of reh'g* (Nov. 30, 2000).

The Petitioner asserts that the absence of the DNA evidence hampered the Petitioner's ability to present a defense, resulting in a due process violation. The United States Constitution guarantees a meaningful opportunity to present a complete defense, which "'includes the right to introduce evidence that someone other than the accused committed the crime.'" *State v. Bell*, 512 S.W.3d 167, 190 (Tenn. 2015) (quoting *State v. Rice*, 184 S.W.3d 646, 671 (Tenn. 2006)). "[T]he erroneous exclusion of evidence that thwarts a criminal defendant's right to present a defense is constitutional error." *Id.* We observe, however, that the cases cited by the Petitioner analyze whether the defendant had a constitutional right to present evidence in existence at trial which was excluded according to the rules of evidence. *See Rice*, 184 S.W.3d at 673-74; *State v. Brown*, 29 S.W.3d 427, 433-34 (Tenn. 2000). To determine whether such exclusion of evidence rises to constitutional proportions, the court examines whether the excluded evidence is critical to the defense, whether the evidence bears sufficient indicia of reliability, and whether the interest supporting exclusion is substantially important. *Brown*, 29 S.W.3d at 434. We note that this last criterion does not fit easily into the contours of the Petitioner's claim and that the analysis cited by the Petitioner is not the correct framework for determining whether the Petitioner is entitled to relief based on the fact that new DNA evidence came into existence after trial. In any event, we conclude that the DNA evidence was not so material as to render a trial in its absence unconstitutional.

In *Wiley v. State*, the trial court granted the petitioner post-conviction DNA analysis of a towel found at the crime scene. 183 S.W.3d 317, 324 (Tenn. 2006). At trial, the petitioner, who acknowledged having struck the victim with a bottle, claimed that he did so in self-defense after the victim attacked him, and he told police that he was unaware of the severity of the victim's injuries when he left the victim. *Id.* at 320-21. The petitioner asserted that DNA analysis of the towel would reveal the petitioner's own blood and not the victim's blood, supporting the petitioner's contention that the victim attacked and injured him and that he was acting in self-defense. *Id.* at 322-23. The post-conviction court granted testing, and the DNA test results revealed that the towel was indeed stained with the petitioner's own blood. *Id.* at 324. The Tennessee Supreme Court concluded that, while the DNA test results were favorable to the petitioner, the finding of favorable results would not in itself mandate the granting of a new trial. *Id.* at 329. Concluding that "[a]lthough the analysis established the presence of the petitioner's blood at the crime scene, that evidence alone did not establish the petitioner's innocence of the offenses," the court determined that the testing did not show that the verdict or sentence would have been more favorable had the evidence been available at trial, and it denied relief. *Id.* at 328-29.

In *Kenneth Alan Steele v. State*, the petitioner was granted DNA analysis but subsequently denied post-conviction relief. No. E2016-01375-CCA-R3-PC, 2018 WL 842936, at *1 (Tenn. Crim. App. Feb. 13, 2018), *perm. app. denied* (Tenn. June 6, 2018).

The petitioner had committed numerous burglaries and rapes and sought testing of evidence obtained from the victims. *Id.* The results of the testing showed that the samples contained genetic material from multiple sources, but the petitioner was identified as a partial contributor in each sample. *Id.* at *3. This court upheld the denial of relief, noting that, despite the unidentified contributors in the genetic material, the petitioner's genetic material was also present and that his convictions were otherwise supported by strong evidence, including fingerprints. *Id.* Likewise, in *Steven Craig Griffin v. State*, the petitioner was granted DNA testing, and the test revealed that neither he nor his patrilineal relatives could be excluded as the perpetrator. No. M2008-00242-CCA-R3-PC, 2009 WL 564228, at *8 (Tenn. Crim. App. Mar. 5, 2009). This court affirmed the dismissal of the subsequent post-conviction petition, noting that the results of the testing were not favorable, despite the fact that the results could also implicate the petitioner's patrilineal relatives. *Id.*

We conclude that the Petitioner here has not established a violation of the principles of fundamental fairness under due process. *Dowling*, 493 U.S. at 352. We note that the Petitioner could have insisted on DNA testing prior to trial but did not seize the opportunity to do so. Neither has the Petitioner shown a reasonable probability that the results of the proceeding would have been different if the defense had had access to the subsequently performed DNA analysis. *Wiley*, 183 S.W.3d at 328-29. DNA testing cannot, in itself, always resolve a case. *Osborne*, 557 U.S. at 62. "Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent." *Id.*; *see Willie Andrew Cole v. State*, No. M2015-02087-CCA-R3-PC, 2016 WL 4972384, at *4 (Tenn. Crim. App. Sept. 18, 2016) (denying DNA testing based on the conclusion that even if the victim's fingernails yielded DNA from some person other than the petitioner, the overwhelming proof at trial precluded a finding of a reasonable probability of a different result); *Donnie E. Johnson*, 2007 WL 852147, at *7 (denying DNA testing because even if the DNA analysis showed that a plastic bag used in the crime contained DNA linked to someone else, the probability that the bag had been handled by numerous people precluded a reasonable probability that the petitioner would not have been convicted or prosecuted).

Here, the value of the DNA evidence obtained from the knife is marginal at best. Although at trial the State suggested that the knife was the murder weapon, post-conviction testing showed that the knife bore no traces of blood, nor was the DNA of the victim of the bloody crime located anywhere on the knife. In light of these results, the DNA evidence obtained from the knife has negligible value. *Osborne*, 557 U.S. at 82-83 (Alito, J., concurring) ("Any test that is sensitive enough to pick up such trace amounts of DNA will be able to detect even the slightest, unintentional mishandling of evidence."); *Sedley Alley v. State*, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820, at *17 (Tenn. Crim. App. June 22, 2006) ("Accordingly, even should DNA testing reveal the presence

of DNA belonging to a third party, as alleged by the Petitioner, there is a strong possibility that this DNA will not belong to the perpetrator."), *abrogated by Powers*, 343 S.W.3d at 49-50 (concluding that the Act authorizes a comparison of DNA evidence with DNA profiles from a database).

The blade of the knife contained DNA from two unknown sources, and the victim and Petitioner were both excluded as possible contributors to the DNA on the blade. The DNA on the handle was so limited that no conclusions could be drawn about the source, and the Petitioner was not excluded as a possible contributor. Faced with this evidence, the trier of fact could have concluded that the knife was not the murder weapon; that the knife was the murder weapon, had been meticulously cleaned, and had been subsequently contaminated with DNA during the investigation or trial; that the knife was the murder weapon and that it bore the DNA of two phantom perpetrators; or that the knife was the murder weapon and that the perpetrator's DNA, which did not exclude the Petitioner, was on the handle only. Accordingly, while the DNA results from the knife were not inculpatory, neither are they particularly favorable to the Petitioner. *Sedley Alley*, 2006 WL 1703820, at *18 ("Merely detecting DNA from another individual on the victim's clothing, in the absence of any evidence as to how and when that DNA was deposited, would not exculpate the Petitioner….").

While genetic material from a male other than the Petitioner under the victim's fingernails is certainly favorable evidence, we cannot say that the evidence is so strong that there is a reasonable probability that the absence of the evidence at trial affected the results of the proceedings. *See Wiley*, 183 S.W.3d at 328-29. Although the evidence had exculpatory value, it was not exonerating. At trial, Detective Crumby testified that he did not believe the fingernail scrapings required testing, in part because genetic material under the victim's fingernails could have come from domestic contact. Detective Crumby testified, for instance, that his DNA would probably be present under his wife's fingernails. The crime scene showed signs of a struggle, in that various items were knocked over or broken. However, there was also testimony that the victim would throw things when she was intoxicated. The medical examiner testified that the victim had no defensive wounds on her hands. He also testified that the blood evidence was consistent with the victim's having been stabbed as she lay in bed and that the blow to her head may have rendered her unconscious. Accordingly, the physical evidence did not necessarily suggest that the murderer's DNA would be present under the victim's fingernails.

The evidence at trial established that the Petitioner was present in the victim's home on the night of her death. After buying two bottles of orange juice at the dollar store, the Petitioner entered the victim's home. The victim used the Petitioner's telephone to call Mr. Harris multiple times between 9:00 and 10:00 p.m. At some time that night, the victim was stabbed and bled to death. The murderer then made two

incisions under her breasts, in a location that would not normally be exposed. The Petitioner left a bag with the receipt from the dollar store in an upstairs bedroom of the victim's home and subsequently fled the State. When questioned about the murder by police, the Petitioner's response was to ask if Tennessee recognized self-defense. The Petitioner admitted to being involved in an altercation with the victim after inadvertently using the victim's towel. The Petitioner told Detective Crumby that the victim began throwing things and "pulling that little knife." When Detective Crumby suggested, "Then you just defended yourself," the Petitioner responded, "Right." The jury convicted the Petitioner of second degree murder. We conclude that evidence of DNA under the victim's fingernails was not so exculpatory that it would undermine confidence in the verdict or that it raises a reasonable probability of a different result at trial.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE